UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

TAURIGA SCIENCES, INC.

-against-

COWAN, GUNTESKI & CO., P.A., a foreign corporation,
DONALD COWAN, AND WILLIAM MEYLER

CIVIL ACTION NO. 3:16-CV-06285 (PGS) (DEA)

---

# REBUTTAL EXPERT REPORT OF EMANUEL GERARD

Submitted on behalf of the Defendants

October 6, 2017

## I. Introduction

I have prepared this report at the request of Steinberg & Cavaliere, LLP, on behalf of its clients, Cowan Gunteski & Co., P.A., Donald Cowan and William Meyler, for use in the matter entitled *Tauriga Sciences, Inc. v. Cowan Gunteski & Co., P.A.*, Case No. 16-cv-06285 (PGS) (DEA), pending in the United States District Court for the District of New Jersey. I have been asked to respond to the September 6, 2017, Report of Pamela O'Neill of Cushman & Wakefield ("O'Neill Report"), and specifically to Ms. O'Neill's conclusion that plaintiff Tauriga Sciences, Inc. ("Tauriga") suffered "Dilution of Equity" damages as a result of changes in the conversion rights under convertible debt securities held by Union Capital, LLC, and Group 10 Holdings, LLC.

I received my undergraduate degree from Brown University and an MBA from Harvard Business School. I have devoted my career to business and finance, beginning as an Entertainment Research Analyst on Wall Street, later founding Roth, Gerard & Co. From 1974 to 1984, I was a senior executive of Warner Communications Inc., ultimately serving as Co-Chief Operating Officer. I bought Atari for Warner and became involved in the early years of Silicon Valley. Later, I was Chairman of Gerard Klauer Mattison & Co. (GKM) from 1989 to 2003, when it was acquired by the Bank of Montreal. GKM was active in financing smaller companies. From 2003 to 2006 I was Head, US Equities, for BMO Nesbitt Burns. Since 2006 I have regularly advised startup and smaller companies on business development and financing. These companies have included Environmental Waste International, Harmonix Music Systems and ZeniMax Media Inc.

I have not previously testified as an expert or written any professional publications. I am being compensated at the rate of $350 per hour for my time on this matter. My compensation is unrelated to the outcome of this matter, and I am independent of the parties in this dispute.

In reaching my opinions and conclusions in this report, I have considered the documents listed in Appendix A. Except as indicated below, I have accepted the material filed by Tauriga (including filings made when the company was known by other names) with the Securities and Exchange Commission ("SEC") without further verification, although they are often inaccurate and self-contradictory.

## II. Analytical Methodology

My approach to analyzing a business is to begin with a broad view of its history with emphasis on how it has fared over time, both absolutely and relative to its peers. How management has dealt with success and failure is critical. This includes both operations and financing. How management has raised capital and deployed its capital is a clear indicator of its abilities and prospects. Management's ability to realistically understand what it can reasonably accomplish, both financially and organizationally, is very important. I have learned to ask myself if management's judgment is sound based on its actions, and if it appears to do its homework.

Apart from modest income during its five years in the wine business (aggregating $1.6 million, most of which was received in 2006), ending in 2008, Tauriga has generated virtually no other revenue from business operations, has lost money every year of its existence, and has continuously struggled to stay alive financially. Since its inception, the company's Annual Reports on Form 10-K have consistently included an auditor's report which expresses a "going concern" assumption: that the company's "significant operating losses" and need for additional financing "raise substantial doubt about the Company's ability to continue as a going concern."

Much standard financial analysis is not directly applicable to Tauriga, but I will return to these factors later in this report.

### III. Background

Tauriga (then known as New England Acquisitions, Inc.) was formed on April 8, 2001, as a "blank check" company. As such it was a developmental stage company seeking to acquire companies, businesses or technologies. Unlike many blank check companies, which are substantially funded up front or go public to amass a large amount of cash, Tauriga had virtually no capital at the outset.

Table 1 summarizes the company's corporate evolution, showing changes in corporate name, CEOs, employees and capitalization. The original promoters were unsuccessful in raising any meaningful amount of money and control shifted to a group who owned a South African winery in December 2003. The wine business (under the name Atlantic Wine Agencies, Inc.) was unsuccessful, the assets were disposed of, and Antonio Treminio was named CEO in October 2008. The company was renamed Novo Energies Corporation in 2009. Novo began to "develop a new process to transform plastic and tire waste products into liquid fuels such as diesel, gasoline and fuel additives" (2009 Annual Report on Form 10-K, p. 5), which remained its stated mission until May 2011, when it signed a Memorandum of Understanding ("MOU") to acquire Immunovative Clinical Research, Inc. ("ICRI"). Novo generated no revenues. The company abandoned its energy business aspirations and changed its name to Immunovative, Inc., in May 2012.

Seth Shaw became CEO of Immunovative in August 2012. In December 2012 the company signed an exclusive worldwide License Agreement with Immunovative Therapies, Ltd. ("ITL"), the Israeli parent of ICRI, to commercialize all current and future patents "to develop the next generation of immunotherapies to treat cancer." 2012 10-K, p. 4. The company was to provide

$10 million to the development process. After the company had advanced approximately $3.5 million to ITL in only a few months, and generated no revenue, ITL terminated the license agreement in January 2013. Under a settlement agreement reached the next month, ITL paid the company $20,000, gave stock equal to nine percent of its outstanding shares, and required Immunovative, Inc. to change its name. The company incurred $385,000 in legal expenses in connection with the termination of the license agreement, and became Tauriga Sciences, Inc. in March 2013.

On March 31, 2013, the close of its fiscal year, Tauriga had 226,499,000 shares of common stock outstanding, current assets of $170,474, current liabilities of $1,183,498, accumulated deficits over $32 million, negative net worth of $984,642, and no business. As before (and since), its auditor's report included a "going concern" assumption.

Tauriga has been unprofitable and has had negative net worth in every year of its existence. In every Annual Report on Form 10-K since 2008, it has acknowledged its material weakness in its control over financial reporting. From fiscal 2012 to the present, Tauriga's common stock has been considered a "penny stock" under the Securities Exchange Act of 1934, which can hinder trading activity and stock sales by investors.

### IV. Death Spiral Convertibles

"Death spiral" convertibles are generally privately held notes or debentures which permit lenders to convert the amount loaned (and interest) into equity (shares of common stock) at a discount, *i.e.*, at prices below the public market price for the shares. The issuers of such securities are usually small capitalization, unseasoned companies whose financing options are limited. Academic studies indicate that sharp stock price declines usually follow issuance of these

securities. When the lender sells stock acquired at a discount, the market price may be depressed, resulting in the lender receiving *more* shares (due to a further reduced conversion price) on its next conversion, creating a vicious cycle. Hence the name "death spiral."

On January 26, 2010, the company issued a $500,000 secured convertible debenture due January 26, 2011; interest at the annual rate of 10% was payable monthly. Virtually all the company's assets were pledged as collateral. Principal and interest were convertible into unregistered common stock at the *lesser* of 100% of the common stock's volume weighted average price ("VWAP") on the day prior to conversion and a 15% discount to the lowest closing VWAP during the five days prior to conversion. The company issued 6,085,193 shares of common stock (which Tauriga stated was "equivalent" to $1,500,000) at the closing to obtain the loan. The debenture went into default and the original investor transferred its rights to Green Eagle Capital Corp; Seth Shaw was the President of Green Eagle. On June 9, 2011, the outstanding principal and interest of $682,000 was extinguished for 10 million shares of Tauriga common stock. Of these, 6,678,320 shares were due under the original terms of the debenture, and an additional 3,321,680 shares were issued to effect the settlement. Somewhat inconsistently, according to a conversion agreement dated July 8, 2011, the company and Green Eagle agreed to settle the debt for 10 million shares of common stock because "a calculation of the conversion price pursuant to the Debenture is impossible due to the persistently low trading volume of the Company's common stock" (Exhibit 10.2 to the company's 2012 Annual Report on Form 10-K).

The company was in the death spiral universe. On November 21, 2013, a Unanimous Written Consent of the Directors of Tauriga (including Shaw) specifically acknowledged the potential for dilution that could result from issuing a debenture which could be converted into a practically unlimited amount of common stock, the adverse effect on the price of the company's stock and

impairment of the company's ability to raise additional capital. The Board approved moving forward with such a transaction, and the company has done numerous similar transactions since.

## V. Tauriga March 31, 2012 to March 31, 2015

Seth Shaw was involved with Tauriga for this entire period. Shaw became a consultant to Tauriga in August 2010, "To assist the Company in developing a business strategy, an acquisition strategy and other services." 2011 10-K, p. 4. He was named CEO in August 2012. His experience was largely in securing financing for companies: "Over the past seven years, he has been instrumental in securing more than $60 million in capital, in aggregate, for several small-cap and micro-cap companies." 2013 10-K, p. 18. Shaw resigned as CEO in February 2014, but stayed on as Vice President, Strategic Planning, until he became CEO again in July 2015. Dr. Stella Sung was named CEO in February 2014, having previously been COO.

In this three-year period the company's outstanding shares of common stock nearly quadrupled from 226,499,000 to 899,008,000, as detailed in Table 2. Nearly 300 million shares were issued to consultants, company executives and for settlements. The company had become a virtual stock printing machine.

Table 3 details the five principal businesses Tauriga became involved with or acquired in the three years ended March 31, 2015. One license was terminated and the other four were written off. Pilus Energy was written off because the company could not finance the required commercial testing. Yet, Tauriga stated, "Both management teams [Pilus and Tauriga] are highly confident that the capital and liquidity needs will be sufficiently met through commitments from existing institutional investors and progress in non-dilutive funding initiatives (i.e., grants, low interest loans)." 2014 10-K, p. 4. This statement proved totally incorrect.

6

By June 30, 2015, the company had no meaningful operations. It had made a string of unwise and commercially unsuccessful deals, apparently failed to conduct appropriate due diligence, overestimated its ability to raise capital, and issued stock—and securities convertible into common stock at a discount from the market—simply to survive. Its stock was collapsing in response to its seemingly endless economic reversals, as detailed below.

**VI. Tauriga on June 30, 2015, and July 31, 2015**

At June 30, 2015, Tauriga had $199,000 in current assets, $1,543,000 in current liabilities and 941,825,933 shares of common stock outstanding. Its accumulated deficit was $49,495,000. It had no meaningful business or business prospects, had never achieved a positive net worth, and depended on death spiral financings for survival. In the fiscal year ended March 31, 2014, Tauriga entered into approximately 30 such financings, from which it obtained gross proceeds of $2,047,000. During the two fiscal years ended March 31, 2015, Tauriga issued over 250,000,000 shares of common stock for conversions of convertible notes and debentures.

No convertible notes were outstanding on March 31, 2015. On May 28, 2015, $104,000 principal ($100,000 proceeds) of a 7% Convertible Redeemable Note due May 26, 2016, was placed with Union Capital. On July 14, 2015, a 12% $96,000 principal ($80,000 proceeds) convertible debenture was placed with Group 10 Holdings. Both these instruments had the classic features of death spiral financings.

Table 4 summarizes Tauriga's high and low stock prices quarterly, from 2013 through the period being analyzed. It is particularly important to note that the price dropped below $0.01 per share in the quarter ended March 31, 2015, and never traded above $0.01 in the quarter ended June 30, 2015.

7

Tauriga issued a press release on April 23, 2015, recognizing that its share price had closed with a bid of less than a penny per share for under 30 days, but noted that even if the price stayed below that level for more than 30 days, there was a 180-day grace period to close with a bid of at least a penny for 10 consecutive days to regain compliance and remain listed for trading on the OTCQB. Management obviously knew of this risk when it signed the Union Capital and Group 10 Holdings death spiral financings on May 28 and July 14, 2015.

By July 30, 2015, the bid price for Tauriga common stock had remained below $0.01 for about 85 consecutive trading days. This was the state of Tauriga *before* it was determined that the audit for the March 31, 2014, fiscal year could not be relied on, and *before* the shares were downgraded from the OTCQB Exchange to OTC Pink Limited Information on July 31, 2015.

## VII. The O'Neill Report

I am addressing only the portion of the O'Neill report under "Dilution of Equity" (pages 5 to 9 and the accompanying Exhibits).

It is disingenuous for O'Neill to say Tauriga "sought" this type of financing. Death spirals are "sought" only in the absence of alternatives. The O'Neill Report says, "Based on my discussions with Tauriga management, it was not the Company's intention to secure such financing, despite the risk of accepting a market based conversion feature in both of its new security issuances. Tauriga management indicated that it would not have secured convertible debenture financing if it had known that its stock would have been delisted." O'Neill Report, p. 6. Yet, by the company's own April 23, 2015, press release and 8-K filing, it knew it was seriously at risk of downgrading from OTCQB trading when it signed the Union Capital note and the Group 10 debenture.

The April 23, 2015, press release discussed two other things. It estimated revenues for the quarter ended June 30, 2015, from Tauriga's "natural wellness" business would be about $50,000 ($41,000 was reported), over 60% higher than the quarter ended March 31, 2015. The natural wellness business was discontinued on August 11, 2015; inventory was sold for $20,462 and a loss on disposal of $229,904 was recorded. The press release also discussed Pilus Energy, stressing certain technical achievements. By early July 2015, the company knew its investment in Pilus would have to be written off because of a lack of funding. The stock was in a state of collapse and these operations, Tauriga's last faint hope, were essentially dead.

Any objective analysis of the company's business (or lack of business), the state of its balance sheet and prospects would conclude that downgraded trading—or worse—was highly probable, barring a miracle. The downgrade was less than four months away, with no reasonable prospect on the horizon.

The O'Neill report makes much of the distraction the delisting caused in making other acquisitions. Given management's historical performance, that may have been a good thing.

The O'Neill Report attempts to create a dollar value for the dilution resulting from the conversions by Union Capital and Group 10 Holdings at conversion prices (and penalties) resulting from Tauriga's non-compliance with SEC reporting requirements and the downgrade in OTC trading level. I have sought, but not found, any academic (or other) established approach to this issue. Not surprisingly, Ms. O'Neill cites no support for her approach. My starting point is to determine what value is allegedly diluted. I do not believe there was *any* inherent value in Tauriga in July 2015, nor apparently did the market. Multiplying a dizzyingly increasing number of shares by an increasingly *de minimis* market price does *not* establish value. It is nothing more


than a mathematical calculation. And Ms. O'Neill simply ignores the hundreds of millions of shares issued to consultants, executives and for settlements, as shown in Table 2.

If the calculation game must be played, so be it. On June 30, 2015, Tauriga stock closed at $0.0038; on June 30, 2015, there were 941,826,000 shares outstanding. Multiplication results in $3,578,939. The company's negative net worth (stockholders' deficit) was $1,320,864. The O'Neill Report places a cash value of $2,232,000 on the "economic harm" from dilution, offering no rational explanation. This is an absurd conclusion.

There was, in fact, *no* discernable economic harm to Tauriga. It was simply obliged to issue additional shares of common stock, a practice it had followed, without hesitation, for many years.

Emanuel Gerard

October 6, 2017

TABLE 1

**TAURIGA SCIENCES, INC.**
**Corporate Evolution**

| Years to March 31 | Corporate Name | CEO | Number of Employees | Common Shares as of March 31st *Outstanding | Authorized |
|---|---|---|---|---|---|
| 2002 | New England Acquisitions, Inc. | Gary Cella | 2 | 2,000 | 150,000,000 |
| 2003 | | Gary Cella | 2 | 2,000 | 150,000,000 |
| 2004 | Atlantic Wine Agencies, Inc. | Harry Chauhan | 1 | 488,000 | 150,000,000 |
| 2005 | | Adam Mauerberger | 1 | 10,181,000 | 150,000,000 |
| 2006 | | Adam Mauerberger | 2 | 10,359,000 | 150,000,000 |
| 2007 | | Adam Mauerberger | 1 | 10,359,000 | 150,000,000 |
| 2008 | | Adam Mauerberger | 1 | 13,563,000 | 150,000,000 |
| 2009 | Novo Energies Corporation | Mauerberger & Antonio Treminio | 2 | 17,152,000 | 1,000,000,000 |
| 2010 | | Antonio Treminio | 3 | 34,345,000 | 1,000,000,000 |
| 2011 | | Antonio Treminio | 2 | 53,245,000 | 1,000,000,000 |
| 2012 | Immunovative, Inc. | Antonio Treminio | 2 | 116,668,000 | 1,000,000,000 |
| 2013 | Tauriga Sciences, Inc. | Treminio & Seth Shaw | FT 2 | 226,499,000 | 1,000,000,000 |
| 2014 | | Seth Shaw & Stella Sung | FT 3 | 641,071,000 | 1,000,000,000 |
| 2015 | | Stella Sung | Consult 2 | 899,098,000 | 1,000,000,000 |
| 2016 | | Seth Shaw | Consult 2 | 1,219,821,000 | 2,500,000,000 |
| 2017 | | Seth Shaw | Consult 2 | 1,734,920,000 | 2,500,000,000 |
| 2017 June 30th | | | | 2,072,882,000 | 7,500,000,000 |

*Adjusted for all stock splits.

Note: Company 10-Ks are the source of all this information.
FT means full time in employees. Consult means "consultants devoting substantially full-time services to the Company."

Table 2

**Tauriga Sciences**
**Common Shares Issued in Three Years Ended March 31, 2015**

| | |
|---|---:|
| Sales of Common Stock (incl. costs) | 169,935,000 |
| Conversion of Debt (incl. costs) | 268,000,000 |
| Paid to Executives | 56,233,000 |
| Paid to Consultants | 211,340,000 |
| Warrant Exercises | 38,871,000 |
| Settlements | 20,000,000 |
| Licenses | 13,370,000 |
| Payables | 3,100,000 |
| **Total** | **782,340,000** |

Table 3

**Tauriga Sciences**
**Corporate Development from March 31, 2012 to March 31, 2015**

| Date | Deal | Company | Business | Execution | Result |
|---|---|---|---|---|---|
| Dec-12 | License | Immunovative Therapies, Ltd (LTI) | Development of next generation immunotherapies to treat cancer. | Tauriga to provide $10 million to fund trial. Funds about $3.5 milllion. | License terminated February 2013. LTI pays $20,000 and Tauriga gets 9% of LTI and incurs legal fees of $385,000 |
| May-13 | License | Green Innovations, Inc. | Bamboo based products including hospital grade biodegradable disinfectant wipes. | $144,00 cash plus 6,848,000 shares. | Written off as of March 31, 2014. |
| Oct-13 | Strategic Alliance | Bacterial Robotics, LLC | Developing ubiquitous microscopic robotics for nuclear industry. | $50,000 cash plus 75 million warrants at $0.02 per share. | Written off as of March 31, 2014. |
| Jan-14 | Purchase | Pilus Energy LLC | Developing cleantech energy platforms using microbial solutions that creates energy while consuming polluting molecules from wastewater. | $100,000 cash plus 100 million warrants at $0.02 per share. | Written off as of March 31,2014 |
| Mar-14 | Purchase Agreement | Honeywood, LLC | Medicinal therapeutic cannabis product. | Advanced $175,000 in cash plus $249,000 in legal fees. | Written of as of March 31, 2015. |

Table 4

TAURIGA STOCK PRICE
Calendar Quarters

| | 2013 High | 2013 Low | 2014 High | 2014 Low | 2015 High | 2015 Low | 2016 High | 2016 Low | 2017 High | 2017 Low |
|---|---|---|---|---|---|---|---|---|---|---|
| Q to 3/31 | 0.15 | 0.09 | 0.11 | 0.01 | 0.017 | 0.009 | 0.0060 | 0.0020 | 0.0062 | 0.0018 |
| Q to 6/30 | 0.11 | 0.05 | 0.05 | 0.02 | 0.009 | 0.005 | 0.0099 | 0.0044 | | |
| Q to 9/30 | 0.05 | 0.02 | 0.08 | 0.02 | 0.008 | 0.002 | 0.0080 | 0.0031 | | |
| Q to 12/31 | 0.03 | 0.01 | 0.02 | 0.01 | 0.005 | 0.002 | 0.0088 | 0.0038 | | |

Source 10Ks

## Appendix A
## Documents Provided to and Considered by Emanuel Gerard

Pamela O'Neill Expert Witness Report September 6, 2017

Pierre Hillion & Theo Vermaelen, *Death Spiral Convertibles* (2001)

John D Finnerty, *Short Selling, Death Spiral Convertibles, and the Profitability of Stock Market Manipulation* (2005)

Austin Dwyer, *Death Spiral Convertible Bonds* (2017)

Group 10 Debenture July 14, 2015 (PLA000013-30)

Union Capital Note May 28, 2015 (KBL 005894-5901)

Written Consent of the Directors of Tauriga Sciences, Inc., November 21, 2013 (KBL 000252-55)

E-mail from Seth Shaw to Michael Pollack *et al.*, July 9, 2015 (Spire000785-86)

New England Acquisitions Form SB-2 June 20, 2001

New England Acquisitions Amendment No. 1 to Form SB-2 October 16, 2001

New England Acquisitions Form 10-KSB fye March 31, 2002

New England Acquisitions Form 10-KSB fye March 31, 2003

Atlantic Wine Agencies, Inc. Form 10-KSB fye March 31, 2004

Atlantic Wine Agencies, Inc. Form 10-KSB fye March 31, 2005

Atlantic Wine Agencies, Inc. Form 10-KSB fye March 31, 2006

Atlantic Wine Agencies, Inc. Form 10-KSB fye March 31, 2007

Atlantic Wine Agencies, Inc. Form 10-KSB fye March 31, 2008

Novo Energies Corp. Form 10-K fye March 31, 2009

Novo Energies Corp Form 8-K ex10.2 February 17, 2010 (Trafalgar Note)

Novo Energies Corp. Form 10-K fye March 31, 2010

Novo Energies Corp. Form 10-K fye March 31, 2011

Novo Energies Corp. Form 10-K fye March 31, 2011, ex10.1 (Debt Assignment Agreement)

Novo Energies Corp. Form 10-K fye March 31, 2011, ex10.2 (Conversion Agreement)

Immunovative, Inc. Form 10-K fye March 31, 2012

Tauriga Sciences Form 10-K fye March 31, 2013

Tauriga Sciences Form 10-K fye March 31, 2014

Tauriga Sciences Form 10-K fye March 31, 2015

Tauriga Sciences Form 8-K April 23, 2015

Tauriga Sciences Form 8-K ex. 99.1 April 23, 2015 (press release)

Tauriga Sciences Form 8-K, June 1, 2015

Tauriga Sciences Form 10-Q fqe June 30, 2015

Tauriga Sciences Form 8-K, July 27, 2015

Tauriga Sciences Form 10-Q fqe September 30, 2015

Tauriga Sciences Form 10-K fye March 31, 2016

Tauriga Sciences Form 10-K fye March 31, 2017

Tauriga Sciences Form 10-Q fqe June 30, 2017

Ownership Information TAURIGA SCIENCES, INC (Part 1)

Ownership Information TAURIGA SCIENCES, INC (Part 2)

https://www.otcmarkets.com/stock/TAUG/chart